### L. P. TURNER v. STATE.

No. A-9959.  April 15, 1942.

(125 P. 2d 222.)

242

Emmons Arrington, of Shawnee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant, L. P. Turner, was charged in the district court of Pottawatomie county with the crime of murder, was tried, found guilty of manslaughter in the first degree, and sentenced to serve four years in the State Penitentiary, and has appealed.

There is very little dispute in the evidence offered by the state and the defense as to the facts surrounding the homicide. The deceased, Bill Erwin, was killed by two shots fired from a pistol by the defendant in Murphy's Place, which was a beer tavern and pool hall in the town of St. Louis, Okla.

The deceased was a driller employed by the Magnolia Petroleum Company in the oil fields near St. Louis. The

defendant was employed as bartender at Murphy's Place, where the killing occurred.

The proof showed that about 5 p. m., November 11, 1939, the deceased, Bill Erwin, came into the beer tavern and approached Pop Naylor, who was sitting in a booth on the east side of the building. The said Pop Naylor had been drunk in the building a few hours before and while he was asleep his pocketbook was taken. The testimony showed that Ray Rider, a friend of Naylor's, had taken his money for safekeeping after Naylor had fallen asleep at a table.

Someone had told the deceased, Bill Erwin, that Naylor had been told that he, Bill Erwin, had gotten his money. The deceased asked Naylor who had told him that he had gotten his money and Naylor refused to tell the deceased. The deceased then started asking everybody in the house if they had said that he had gotten Pop Naylor's money and further stated that "There ain't a damn son-of-a-bitch that will come up and tell me that." Later the deceased approached the defendant, who was sitting behind the counter, grabbed the defendant by the arm and said: "Doc, you old son-of-a-bitch, you started that." The defendant jerked his arm loose from the deceased, ducked down behind the counter and came up with a pistol and fired twice. Both shots hit the deceased and caused his death a few hours later.

There were many parties in the pool hall at the time the shooting occurred and they all testified to substantially the above facts. It is undisputed that the deceased did not have anything in his hands when he approached the defendant and grabbed him by the arm.

It is contended that the court erred in refusing to give certain instructions requested by the defendant. The instructions requested by the defendant were substantially

correct and are such as are applicable generally to homicide cases where the issue of self-defense is raised. We have examined the instructions given by the court. Thirty-seven different instructions were given. The two instructions requested by the defendant are fully covered by the instructions of the court. Twelve of the instructions given by the court are on the law of self-defense and they were very full and comprehensive. In fact, some of these instructions were far more favorable to the defendant than he was entitled to. The testimony of the defendant himself was very weak so far as supporting a plea of self-defense. The defendant testified:

"A. Pop got up and started towards the back, and Bill turned around and rushed over to the bar and says, 'Pop says you are the old son-of-a-bitch that said it,' and grabbed hold of me and I jerked loose and dropped down and got the first thing I could get my hands on. Q. (By Mr. Arrington, Attorney for Defendant) Had you said anything to Bill? A. No, sir; not one word to him after he came in the house. In the early part of the evening he came in and started back, about an hour before that, and asked if anybody was back there, and I said no, and that is the only time I spoke to him that day. Q. Did you observe Bill's condition as to being drunk or sober? A. He was either drunk or awful mad, one; I judge he was drunk or mad. Q. You say he made a pass at you? A. He raised his hand to hit me and I just dropped behind the bar; just dropped down. * * * Q. Just tell the Court and jury in your own words from the time that Bill addressed you and started towards you, or started towards you and addressed you, what did happen, the way it happened, how it happened and why you came to use that gun? A. Well, he run up and grabbed hold of me and I jerked loose. I just got excited and grabbed this gun and come up and was afraid he was going to harm me and I come up shooting; that is all there was to it. * * * Q. What was your purpose in using that gun? A. I just lost my head and grabbed it; that is all there was to it.

Q. Were you afraid of him? A. Well, I can't say I was particularly afraid of him; I was just excited. * * * Q. (By Mr. Wyatt, County Attorney) Did he ever make any attempt to come over the counter? A. No, sir; he just grabbed hold and jerked me and I jerked loose from him. Q. Then you got the gun? A. Yes, sir. Q. When you come up with the gun did you say anything to him? A. I didn't say a word. Q. Did you warn him to stand back? A. No, sir; I didn't say nothing. He was right at the counter and I was excited and didn't take any chances. Q. Did he strike at you? A. He raised his hand to strike at me. Q. When you came up with the gun? A. Oh, no. Q. After you came up with the gun he never made any attempt to strike at you? A. I couldn't say that, because I was so excited I didn't pay any attention to it; I just seen him standing there."

It appears from this testimony that at the time the defendant secured the gun, raised up and shot the deceased, the deceased was making no advance n o r attempting in any way to injure the defendant. From the testimony of the defendant himself it would seem that he was fortunate in receiving no more than four years imprisonment in the State Penitentiary for this unlawful act.

The defendant presents the further contention that the assistant county attorney, in his argument to the jury, made prejudicial and improper statements. Counsel for defendant cite in their brief one excerpt from the argument of the assistant county attorney in which it is shown that the prosecutor stated: "And there was a poker game in the back room." This is all of the argument of the prosecutor which is incorporated in the case-made. There is nothing in the record as to what had previously been said by the prosecutor in connection with that remark, but only the single excerpt is presented to this court.

We find from an examination of the record that there was no direct testimony that a poker game was in progress in the pool hall, although one witness did state that people were sitting back there "talking and gambling or doing, whatever they were."

We cannot conclude that this argument of the assistant county attorney prejudiced the jury in view of the evidence of the defendant himself and the fact that the jury assessed the minimum punishment for manslaughter in the first degree.

We have examined the entire record. It is our opinion that the defendant had a fair and impartial trial. He was well represented, but the facts were so overwhelmingly against him that the jury, under their oaths of office, could have done nothing else than have rendered a verdict of guilty.

The judgment of the district court of Pottawatomie county is accordingly affirmed.

BAREFOOT, P. J., and DOYLE, J., concur.